**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

Dated: 12:33 PM March 30, 2020

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: | ) CHAPTER 7 |
| | ) |
| BRIAN M. STIMER and | ) CASE NO. 17-62773 |
| ROSE LEE STIMER, | ) |
| | ) ADV. NO. 18-06035 |
| Debtors. | ) |
| | ) JUDGE RUSS KENDIG |
| | ) |
| LISA M. BARBACCI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BRIAN M. STIMER, | ) **MEMORANDUM OF OPINION** |
| | ) **(NOT FOR PUBLICATION)** |
| Defendant. | ) |
| | ) |

## I. INTRODUCTION

Defendant and his wife were once comparatively wealthy. But now they are in bankruptcy court, and Plaintiff is seeking to deny Defendant's discharge. Plaintiff claims that Defendant has failed to explain how he went from millionaire to bankrupt, and Plaintiff argues that this warrants a denial of his discharge. Defendant argues otherwise.

The court held a trial on February 4, 2020, after which the court set a briefing schedule. The parties have filed their briefs and this matter is properly before the court. In rendering this decision, the court has considered the testimony of the witnesses and the exhibits admitted into evidence during the trial.

## II. JURISDICTION

The court has subject matter jurisdiction under 28 U.S.C. § 1334 and the general order of reference entered in this district. This matter is a core proceeding and the court has authority to enter final orders. 28 U.S.C. § 157(b)(2)(J). Pursuant to 28 U.S.C. §§ 1408 and 1409, venue in this court is proper. This opinion constitutes the court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.[1]

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## III. BACKGROUND

Prior to his bankruptcy, Defendant was involved in several successful businesses. Defendant co-owned Midwest Digital, Midwest Communication, and Group Midwest Inc. (collectively, the "Midwest Companies") with his business partner, George Dixon ("Dixon"). The Midwest Companies were formed in the late eighties, and they were primarily involved in the resale of telephone-related hardware to phone companies and other vendors. The Midwest Companies were very profitable, and in some years, Defendant and Dixon would each make over half a million dollars in salary and bonuses.

But a perfect storm of events caused the Midwest Companies to sink. In 2008, telecommunications technology had changed, and the Midwest Companies could no longer compete with the equipment phone companies were using. The Midwest Companies experienced cash flow problems, and FirstMerit Bank pulled the Midwest Companies' line of credit during the national financial panic. By 2012, the Midwest Companies ceased operations entirely.[2]

Defendant's day-to-day involvement with the Midwest Companies ended in 2010, when he took a leave of absence to take care of his mother who was suffering from Alzheimer's disease. Defendant took care of his mother on a full-time basis from 2010 to 2015, but also

---

[1] Hereinafter, any reference to a section ("§" or "section") refers to a section in Title 11 of the United States Code (the "Bankruptcy Code"), and any reference to a "Rule" refers to a Federal Rule of Bankruptcy Procedure.

[2] In May of 2012, Dixon and his wife organized "Midwest ComTel, Inc.," which is separate from the Midwest Companies. Defendant was not involved with this entity.

worked a few jobs during this time.[3]  Meanwhile, Defendant's wife, Rose, found work at a jewelry store until 2018, which ceased operating, and thereafter she got a job as a bookkeeper.

In addition to the Midwest Companies, Defendant and Dixon also owned B&K Leasing, Ltd. ("B&K").  B&K owned a property on 6299 Dressler Road, North Canton, Ohio 44720 (the "Dressler Road Property"), which it leased to Diebold, Inc.  B&K had an escrow account with Premier Bank for the Dressler Road Property, and Dixon and Defendant's names were on the account.  In 2010, there was approximately $300,000 in the escrow account.  But in 2012, an individual named "Chad" in Diebold's real estate division called Defendant and informed him that the property tax had not been paid for 2 years.  Defendant went to Premier Bank and paid $2,800 to get copies of cancelled checks purporting to show that Dixon and his wife had siphoned the money from the escrow account.[4]  Defendant testified that he took the checks to Chad to show him what had happened.  Because of the escrow shortage, the Dressler Road Property was foreclosed and sold at a sheriff's sale in 2014.  Defendant did not retain copies of the cancelled checks.

Defendant was also involved with a company called Edward D. Fleeman, Inc. ("EDF").  EDF's business plan involved: (i) canvassing areas that did not already have natural gas; (ii) raising money to build a pipeline in those areas; and (iii) then conveying the pipeline to a cooperative association, All American Energy Cooperative Association, Inc. (the "Cooperative"), in exchange for a "throughput fee" for gas flowing through the pipeline.  In 2004, EDF sold its rights to these throughput fees to various investors, including Defendant.  Defendant originally invested approximately $66,000.  Under the investment agreement, Defendant would be repaid his original investment from EDF's future earnings.  Once Defendant was repaid, Defendant and the other investors would split the future earnings with EDF.  Defendant did not have an ownership interest in EDF.  Rather, Defendant owned a contract right to fees paid into EDF (the "EDF Contract Rights").

But the investment was not risk-free: There was always a risk that a pipeline would not be built, and EDF was competing with companies such as Columbia Gas of Ohio, Inc.  The exact date is not clear, but at one time EDF worked with a farmer who bought Firestone Farms in Mahoning county and Columbiana county.  The farmer had bought over 1000 acres, had built golf courses, and had planned to build residences and commercial properties.  EDF worked with the farmer to sign up the Cooperative to eventually deliver gas to the properties.  But Firestone Farms had development problems, it did not fulfill the 1000-acre project and only 170 homes were constructed.

In 2012, Defendant realized his EDF Contract Rights were, in his words, "a bad investment."  On August 3, 2017, after five years of trying to locate a buyer, Defendant finally

---

[3]  For example, after the Midwest Companies failed Defendant briefly owned and operated a company called "Poly Pro," which was involved in recycling Styrofoam.  However, Poly Pro was unsuccessful and ceased operating in 2016.  (Pl's. Ex. D. at 13-14.)

[4]  At trial, Dixon denied that he took money from the escrow account.

sold the rights to Michael Kell for $5,000. At that point, Defendant was still owed over $19,000 from EDF to cover his original investment but just wanted out of the venture.

On the whole, the court did not find Defendant to be a savvy business person. Rather, the distinct appearance was of someone who developed a profitable model, but when that model changed was unable to adapt. In fact, it was obvious that at times Defendant acted out the proverbial "burying his head in the sand" to his profound detriment. The limited discussion of actions taken during the demise of the Midwest Companies revealed a pattern of poorly thought out action and inaction coupled with active avoidance of reality. This is regrettable, not punishable. Moreover, Defendant's errors were primarily in the nature of inaccurate descriptions which provided the information needed to inquire, not outright omissions. This belies an intent to deceive.

Defendant and his wife filed a joint petition for relief under chapter 7 of the Bankruptcy Code on December 21, 2017. In his Schedule A/B, Defendant incorrectly listed a 25% ownership interest in EDF. Defendant also disclosed ownership interests in the Midwest Companies and B&K. On Line 18 of Defendant's Statement of Financial Affairs, he listed a redemption of 47 shares of stock worth $3,300. However, Defendant did not disclose the sale of his EDF Contract Rights.

The initial 341 Meeting of Creditors was held on February 6, 2018. The meeting was concluded early at Plaintiff's request because Plaintiff needed additional time to review records and fully discuss Defendant's Statement of Financial Affairs and schedules. The meeting was reconvened on February 8, at which time Plaintiff and Defendant had the following exchange regarding EDF:

```
20    TRUSTEE BARBACCI:  Okay.  How about the next
21    one?
22    MR. STIMER:  Edward E. Fleeman, Inc.
23    TRUSTEE BARBACCI:  Uh-huh.
24    MR. STIMER:  I had an interest - - he has
25    since passed, that was a gas company that we would - -
1     Eddie ran the thing.  I - - how do I explain this.  Go
2     into areas where you see those big propane tanks,
3     they aren't allowed to get gas because the gas people
4     have to have so many people per foot, lineal foot.
5     We would tap into the main gas lane and offer those
6     people natural gas rather than oil or propane to
7     lower their bills.  And that was a good company.
8     Then Eddie passed away.
9     TRUSTEE BARBACCI:  And what happened then?
10    MR. STIMER:  It - - everybody - -
11    TRUSTEE BARBACCI:  You still have an
12    ownership interest; right?
```

13    MR. STIMER:   No.
14    TRUSTEE BARBACCI:   At 25 percent?   That's how
15    I'm reading it.   That's what this is about for me.
16    You owned 25% of it.   Am I reading that wrong?
17    MR. STIMER:   It's saying I'm owner.   Yeah,
18    no, you're reading it right but I don't own
19    25 percent of it.
20    TRUSTEE BARBACCI:   Well, you just said you
21    reviewed everything and it was accurate and complete,
22    sir.   That's how I read it.   You say you're a
23    25 percent owner.
24    MR. STIMER:   That's what that says.
25    TRUSTEE BARBACCI:   And then that's the back.
1     MR. MORAN:   Well, is it wrong or is it right?
2     MR. STIMER:   Well it was right when I owned
3     25 percent.
4     TRUSTEE BARBACCI:   Do you own it now?   When
5     you filed this case were you 25 percent owner?
6     MR. STIMER:   No.   He passed away four years
7     ago.
8     TRUSTEE BARBACCI:   I don't know what that
9     means.   Is it still operating or it stopped
10    operating?
11    MR. STIMER:   No.   He was the operating
12    officer.   Somebody came along and bought the company
13    and changed the whole thing.
14    TRUSTEE BARBACCI:   What you did get as
15    25 percent owner?
16    MR. STIMER:   I got nothing.
17    TRUSTEE BARBACCI:   Why?   You don't seem like
18    the type of person who will say I will not take
19    anything if somebody bought you out.   What did you
20    get paid for it if you got bought out?
21    MR. STIMER:   I didn't get anything when Eddie
22    died.
23    TRUSTEE BARBACCI:   Who bought it?
24    MR. STIMER:   A guy by the name of Bob Smith
25    TRUSTEE BARBACCI:   Where is Bob Smith from?
1     MR. STIMER:   He's from Cleveland.
2     TRUSTEE BARBACCI:   What did he pay for it?
3     MR. STIMER:   I have no idea.   That was - -
4     TRUSTEE BARBACCI:   When was that?
5     MR. STIMER:   So by the time all that happened
6     I didn't own it.   Ed's wife did.

| | |
|---|---|
| 7 | TRUSTEE BARBACCI: Okay. You're - - I want to |
| 8 | ask you just plain and simple here. All I know about |
| 9 | you and your wife is what are on these papers. And |
| 10 | when I see the paper, it says you're a 25 percent |
| 11 | owner when you filed this case, which was |
| 12 | December 21, 2017. |
| 13 | MR. STIMER: Who wrote that in there? |
| 14 | MRS. STIMER: Well, you would have said |
| 15 | MR. MORAN: Well, I did, based upon what I |
| 16 | understood what you said. |
| 17 | MRS. STIMER: What you said |
| 18 | TRUSTEE BARBACCI: And I asked you - - I swore |
| 19 | you in - - did you review this to make sure it's |
| 20 | complete and accurate? So your testimony now is when |
| 21 | you filed this case - - |
| 22 | MR. STIMER: At one time a long, long time |
| 23 | ago - - |
| 24 | TRUSTEE BARBACCI: Listen to me, okay? |
| 25 | MR. STIMER: Uh-huh. |
| 1 | TRUSTEE BARBACCI: And answer my question. |
| 2 | You filed this case December 21, 2017, sir. At that |
| 3 | point did you have a 25 percent interest in Edward D. |
| 4 | Fleeman, Inc.? |
| 5 | MR. STIMER: No. I'm sorry. I didn't. |
| 6 | TRUSTEE BARBACCI: Okay. So that's |
| 7 | incorrect. So let's go back up. Did you hold an |
| 8 | ownership interest in all the other businesses we |
| 9 | just discussed, starting with Midwest, B&K Leasing, |
| 10 | Midwest Communication, Digital, Poly - - |
| 11 | MR. STIMER: Wait a minute. Wait a second. |
| 12 | I made a mistake. There was a project in Salem a |
| 13 | place called Firestone Farms. That's got to be the |
| 14 | 25 percent. I didn't own 25 percent of the company. |
| 15 | There was a project they did at one time, there was |
| 16 | four guys involved and I was one of those 20 - - one |
| 17 | of those guys. That's where that 25 percent came |
| 18 | from. |
| 19 | TRUSTEE BARBACCI: Of what? |
| 20 | MR. STIMER: Just like what we went into a |
| 21 | neighborhood that you couldn't get gas. |
| 22 | TRUSTEE BARBACCI: December 21, 2017. You've |
| 23 | testified now you didn't have a 25 percent interest |
| 24 | in this. |
| 25 | MR. STIMER: I don't anymore but I did at |

6

| | |
|---|---|
| 1 | that point. |
| 2 | MRS. STIMER: In December - - |
| 3 | TRUSTEE BARBACCI: December 21. I'll ask the |
| 4 | questions. |
| 5 | MR. STIMER: Just last month, you mean? Oh, |
| 6 | no, no, I didn't. |
| 7 | MRS. STIMER: That's what she's asking. |
| 8 | MR. STIMER: But I know where that came from |
| 9 | now. Now I remember. |
| 10 | MR. MORAN: Why don't you tell her. |
| 11 | MR. STIMER: That came from a - - that one |
| 12 | time a long time ago, that's history, but I don't |
| 13 | know how far you want to go back, you know what I |
| 14 | mean? |
| 15 | TRUSTEE BARBACCI: I don't. Here's what I |
| 16 | want from you. No, and it's not funny. I don't know |
| 17 | why you're laughing. |
| 18 | MR. STIMER: No, I'm not laughing. It's not |
| 19 | funny. I never dreamed I'd be here. But I am [s]o I |
| 20 | don't know (inaudible). |
| 21 | TRUSTEE BARBACCI: You filed all of this on |
| 22 | December 21, 2017, all of the schedules. You just |
| 23 | told me they're complete and accurate, and I'm just |
| 24 | trying to ask you some more questions. From what I |
| 25 | heard you testify, this last one here you never - - |
| 1 | MR. STIMER: No. I'm sorry. That's wrong. |
| 2 | I apologize. |

(Pl.'s Ex. D at 15-21.)

Later, Plaintiff asked Defendant about the redemption of shares listed on his Statement of Financial Affairs:

| | |
|---|---|
| 10 | TRUSTEE BARBACCI: I do see something here on |
| 11 | the statement of financial affairs, it's at page 52, |
| 12 | Question 18. About a redemption by a company of 47 |
| 13 | shares for $3,300. What exactly is that? Can you |
| 14 | look at that, Mr. Stimer? |
| 15 | MR. MORAN: You sold your stock. |
| 16 | MR. STIMER: Yeah. |
| 17 | MR. MORAN: You redeemed - - or they redeemed |
| 18 | it. |
| 19 | MR. STIMER: Right. |
| 20 | MR. MORAN: That's what she wants to know, |

| | |
|---|---|
| 21 | what stock and what you got for it. |
| 22 | TRUSTEE BARBACCI:   You got 3,300 and the |
| 23 | stock from which business? |
| 24 | MR. STIMER:   That was from that Edward |
| 25 | Fleeman 25 percent thing that I had. |
| 1 | TRUSTEE BARBACCI:   So that was not that long |
| 2 | ago that that happened.   Is that right? |
| 3 | MR. STIMER:   Well, I had been trying to sell |
| 4 | it for a long time but it finally sold, you know, in |
| 5 | August of last year, I believe. |
| 6 | TRUSTEE BARBACCI:   The company bought it |
| 7 | back; is that right? |
| 8 | MR. STIMER:   No. |
| 9 | TRUSTEE BARBACCI:   I don't understand that. |
| 10 | MR. STIMER:   The company wouldn't buy it |
| 11 | back. |
| 12 | TRUSTEE BARBACCI:   It's page 5 of the |
| 13 | statement of financial affairs, No. 18. |
| 14 | MR. STIMER:   Page 5.   I don't think that's |
| 15 | what that is. |
| 16 | TRUSTEE BARBACCI:   I don't understand that. |
| 17 | I don't know what that is. |
| 18 | MR. MORAN:   Weren't you trying - -[5] |
| 19 | TRUSTEE BARBACCI:   That's why I asked. |
| 20 | MR. MORAN:   Didn't you have stock in, like, |
| 21 | Bob Evans or something? |
| 22 | MR. STIMER:   Oh, that's what it is.   That's |
| 23 | what it is.   Bob Evans. |
| 24 | TRUSTEE BARBACCI:   It's not on here.   It's a |
| 25 | stock redemption. |
| 1 | MR. STIMER:   It was, actually. |
| 2 | TRUSTEE BARBACCI:   And I need to know who |
| 3 | bought the stocks back. |
| 4 | MR. MORAN:   It was publicly traded stock. |
| 5 | TRUSTEE BARBACCI:   Okay.   That was my |
| 6 | question.   You got 3,300.   That was just in November. |
| 7 | MRS. STIMER:   Correct. |

(Id. at 58-61.)

---

[5] At trial, the court admitted the audio file of the 341 Meeting into evidence.   Although it is not reflected in the transcripts of the 341 Meeting, Defendant can be heard saying: "That's not, that's not the right amount" at this point in the conversation.

8

On July 20, 2018, Plaintiff conducted a Rule 2004 Exam of Defendant. At this exam, Defendant was again asked about EDF:

```
9    Q:  Okay.  And Edward D. Fleeman, what was that?
10   A:  Edward is passed away.  He was - -
11   Q:  Now, there's an Edward D. Fleeman, Inc., that you had
12       indicated there was a 25 percent interest in?
13   A:  Yeah, Eddie started a company up and I helped fund it
14       at one time.  That was - - oh boy.  You're going to
15       ask me how long ago that was
16       and I'm guessing it was right around 17 years ago or something.
17   Q:  Okay.  And you still own an interest in that?
18   A:  No.
```

(Pl.'s Ex. E at 22.)

Defendant amended his Schedules and Statement of Financial Affairs on August 21, 2018. In his amended Schedule A/B, Defendant removed his interest in EDF. In his amended Statement of Financial Affairs, Defendant disclosed the sale of his EDF Contract Rights.

On December 3, 2018, Plaintiff filed this adversary proceeding against Defendant. Plaintiff seeks to deny Defendant's discharge under multiple subsections of § 727. Plaintiff's claims revolve around Defendant's alleged lack of transparency regarding: (i) the sale of his EDF Contract Rights; (ii) the Midwest Companies; and (iii) B&K's escrow account.

At trial, Plaintiff had the burden of proving her claims by a preponderance of the evidence. Rule 4005; Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams), 31 F.3d 389, 394 (6th Cir. 1994). Plaintiff failed to meet her burden with respect to each claim.

## IV. LAW & ANALYSIS

The discharge provided by § 727 "is at the heart of the Bankruptcy Code's fresh start provisions." Rafoth v. Chimento (In re Chimento), 43 B.R. 401, 403 (Bankr. N.D. Ohio 1984) (citation omitted). "It embodies the principle that the bankruptcy laws afford to the honest debtor a fresh start in life free from the onus of oppressive debt." Chimento, 43 B.R. at 403 (citation omitted). Consequently, denial of a debtor's discharge is a "drastic measure." Buckeye Retirement Co., LLC., Ltd. v. Hake (In re Hake), 387 B.R. 490, 501 (Bankr. N.D. Ohio 2008). But a discharge is a privilege, not a right, and it is reserved only for the "honest but unfortunate debtor." Gandy v. Schuchardt (In re Gandy), 645 F. App'x 348, 352 (6th Cir. 2016) (citation omitted); Grogan v. Garner, 498 U.S. 279, 286–87 (1991).

1. **Section 727(a)(4)(A) – EDF Contract Rights**

First, Plaintiff seeks a denial of Defendant's discharge under § 727(a)(4)(A). That section provides that the court shall grant a debtor a discharge unless the debtor "knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account . . . ." § 727(a)(4)(A). To deny Defendant's discharge under this section, Plaintiff must prove, by a preponderance of the evidence, that: "1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." Keeney v. Smith (In re Keeney), 227 F.3d 679, 685 (6th Cir. 2000) (citing Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992)).

In Keeney, the Sixth Circuit explained:

> [I]ntent to defraud involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression. A reckless disregard as to whether a representation is true will also satisfy the intent requirement. Courts may deduce fraudulent intent from all the facts and circumstances of a case. However, a debtor is entitled to discharge if false information is the result of mistake or inadvertence. The subject of a false oath is material if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.

Keeney, 227 F.3d at 685-86 (quotation marks and citations omitted). Statements made in a debtor's bankruptcy schedules, Statement of Financial Affairs, the 341 Meeting and testimony at Rule 2004 Exams are made under oath. Church Joint Venture LP v. Blasingame (In re Blasingame), 559 B.R. 692, 697 (B.A.P. 6th Cir. 2016) (citing Montedonico v. Beckham (In re Beckham), No. 08-8054, 2009 Bankr. LEXIS 1345, at *9 (B.A.P. 6th Cir. June 19, 2009)). To determine intent, "the trier of fact is necessarily required to make a subjective inquiry into the debtor's state of mind. Such an inquiry normally requires explanatory testimony by the debtor and an assessment by the trier of fact of the debtor's demeanor and credibility." Hunter v. Sowers (In re Sowers), 229 B.R. 151, 159 (Bankr. N.D. Ohio 1998) (citation omitted).

There is no dispute that Defendant did not disclose the sale of his EDF Contract Rights in his original petition, at the 341 Meeting, and at the Rule 2004 Exam. The issue here concerns whether Defendant possessed the intent to defraud. The court finds that he did not.

Although Defendant does not have a formal diagnosis, both Defendant and Rose testified that Defendant experiences memory issues. They also testified that Rose was responsible for putting together as many documents and records as possible in preparation for the bankruptcy filing. Rose admitted that she was not very familiar with some of Defendant's business interests

10

and investments, including Defendant's EDF Contract Rights.  Rose was under the mistaken impression that Defendant had an ownership interest in EDF, which unfortunately contributed to the inaccurate listing of the entity on Schedule A/B and the omission of the sale of the EDF Contract Rights on the Statement of Financial Affairs.  (See Pl.'s Ex A at 15, 52.)

      Plaintiff cites Barnett Bank of Tampa, N.A. v. Muscatell (In re Muscatell), 113 B.R. 72 (Bankr. M.D. Fla. 1990) for the proposition that Defendant, an experienced businessman, should essentially be held to a higher standard.  (Pl.'s Post-Trial Br. at 4, ECF 47.)  But Muscatell is factually distinguishable.  Muscatell involved a debtor who omitted over $80,000 in disability income, 4 bank accounts, 2 certificates of deposits, 2 safe deposit boxes and at least 18 separate real property transfers within the 1-year period preceding the bankruptcy filing.  Muscatell, 113 B.R. at 74.  In that case, the court explained that "it is inconceivable that the Debtor's 40 omissions in this case and the Debtor's failure to cure these omissions in his four amendments could be acceptable as mere mistakes or inadvertence or oversight."  Id.  Defendant's omission of the sale of his EDF Contract Rights pales in comparison to the debtor's omissions in Muscatell.  Thus, Muscatell is not on point.

      Furthermore, even experienced businessmen can misremember things.  Throughout Defendant's testimony, it became clear to the court that Defendant has difficulties communicating and accurately recollecting details regarding his business dealings and finances without being prompted.  This is also evident from the 341 Meeting: For example, when Plaintiff asked Defendant about the stock redemption listed on his Statement of Financial Affairs, Defendant initially thought Plaintiff was referring to Defendant's sale of his EDF Contract Rights, only to eventually realize that Plaintiff was referring to Defendant's sale of Bob Evans stock.  (Pl.'s Ex. D at 58-61.)  Clearly, Defendant was confused about which interest Plaintiff was referring to.

      "It is well established that 'a debtor has an affirmative duty to disclose all of its assets to the bankruptcy court.'"  Blasingame, 559 B.R. at 697 (quoting Beckham, 2009 Bankr. LEXIS 1345, at *9).  However, an omission caused by mistake or inadvertence does not result in the denial of a debtor's discharge.  See Keeney, 227 F.3d at 685-86.  In this case, the court finds that Defendant did not possess fraudulent intent.  Defendant's omission of the sale of his EDF Contract Rights was instead the result of mistake and/or inadvertence, which he ultimately corrected when he amended his petition on August 21, 2018.  Defendant amended his petition *before* Plaintiff filed her objection to discharge and *before* Plaintiff was even made fully aware of the sale.  Compare with Allard v. Hussan (In re Hussan), 56 B.R. 288, 293 (Bankr. E.D. Mich. 1985) (debtor who only amended petition after trustee realized omissions and filed objection to discharge did not "expunge the falsity of [his] oath." (citation omitted)), and Golden Star Tire v. Smith (In re Smith), 161 B.R. 989, 992 (Bankr. E.D. Ark. 1993) (debtors' initial omissions were made with fraudulent intent; subsequent amendment filed 2 months after objection to discharge did not nullify initial fraudulent intent).[6]  Therefore, Plaintiff's § 727(a)(4)(A) claim fails.

---

[6] If Defendant was acting with fraudulent intent, then why list EDF on Schedule A/B in the first place?  And why would he tell Plaintiff (incorrectly) that the $3,300 from the stock redemption was from the sale of his EDF Contract

## 2. Section 727(a)(3) – The Escrow Account

Next, Plaintiff argues that the Dressler Road Property was a significant asset, and Defendant was required to preserve records regarding the property and the B&K escrow account pursuant to § 727(a)(3). The court disagrees.

Section 727(a)(3) provides that the court shall grant the debtor a discharge unless the debtor "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case . . . ." § 727(a)(3). One of two conditions must be shown to deny a debtor's discharge under § 727(a)(3): "(1) the debtor failed to keep or preserve any recorded information, including books, documents, records, and papers; or (2) the debtor, or someone acting for the debtor, committed an act of destruction, mutilation, falsification, or concealment of any recorded information, including books, documents, records, and papers." Peters v. Michael (In re Michael), 433 B.R. 214, 221 (Bankr. N.D. Ohio 2010).

Under § 727(a)(3), debtors are required "to provide creditors 'with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present.'" Turoczy Bonding Co. v. Strbac (In re Strbac), 235 B.R. 880, 882 (B.A.P. 6th Cir. 1999) (quoting In re Martin, 141 B.R. 986, 995 (Bankr. N.D. Ill. 1992)). "'The adequacy of debtor's records must be determined on a case by case basis. Considerations to make this determination include [the] debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice.'" Turoczy, 235 B.R. at 882 (quoting United States v. Trogdon (In re Trogdon), 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990)). "'The party seeking denial of a discharge has the burden of proving the inadequacy of the debtor's records.'" Turoczy, 235 B.R. at 882 (quoting Wazeter v. Michigan Nat'l Bank (In re Wazeter), 209 B.R. 222, 227 (W.D. Mich. 1997)). "However, 'once a debtor's records are determined to be inadequate, the burden is on the debtor to establish any justification therefor.'" Turoczy, 235 B.R. at 883 (quoting Trogdon, 111 B.R. at 658).

First, the Dressler Road Property was not an asset of Defendant's. It was an asset of an entity in which Defendant had an interest. Defendant was a co-owner of B&K, and B&K, not Defendant, owned the Dressler Road Property. (Def.'s Post-Trial Br. at 7, ECF 48.) Defendant credibly testified that he believed his former business partner emptied the funds from B&K's escrow account. Second, this was a long time ago. Defendant testified credibly that in 2012 he obtained copies of cancelled checks from the escrow account proving this fact and that he gave them to Diebold, Inc., the tenant that paid the money into the escrow and was directly aggrieved. Defendant no longer has the copies; however, Defendant cannot reasonably be expected to preserve these records, since § 727(a)(3) "only imposes upon a debtor a duty to keep and preserve records for a reasonable period of time, with two years having been used as a minimum point of reference." Michael, 433 B.R. at 221 (citing Menotte v. Hahn (In re Hahn), 362 B.R.

---

Rights? Defendant's actions are more indicative of a mistaken memory than fraudulent intent.

12

542, 548 (Bankr. S.D. Fla. 2007)). Furthermore, Defendant, a debtor in bankruptcy court, should not be expected to bear the financial burden of paying $2,800 (for a second time) to obtain copies of cancelled checks from 7 to 8 years ago. Defendant provided Plaintiff with contact information for Home Savings Bank (formerly Premier Bank), and Plaintiff admitted that she did not reach out to the bank or attempt to subpoena the bank for the records. Defendant's explanation was credible. Consequently, Plaintiff's claim fails.

**3. Claims Not Addressed in Plaintiff's Post-Trial Brief**

Plaintiff raised several other claims in her complaint but did not address them in her post-trial brief. The court addresses these claims below. Some of the facts and discussion hereinafter may be relevant to the points raised above and vice versa.

*a. Section 727(a)(4)(D) – EDF Contract Rights*

Plaintiff claims that Defendant should be denied a discharge under § 727(a)(4)(D) for withholding records regarding the sale of his EDF Contract Rights.

Section 727(a)(4)(D) provides in relevant part that the court shall grant the debtor a discharge unless the debtor "knowingly and fraudulently, in or in connection with the case—(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs . . . ." § 727(a)(4)(D). Under this section, the burden is on Plaintiff to prove: "1) the debtor withheld documents relating to the debtor's property or financial affairs; 2) in connection with a case; 3) from an officer of the estate entitled to possession; 4) and such withholding was [done] knowingly and fraudulently." Fidelity & Guaranty Life Ins. Co. v. Settembre (In re Settembre), 425 B.R. 423, 433 (Bankr. W.D. Ky. 2010) (citing Olson v. Slocombe (In re Slocombe), 344 B.R. 529, 534 (Bankr. W.D. Mich. 2006)).

At trial, Defendant produced a copy of the agreement reflecting the sale of his EDF Contract Rights to Michael Kell for $5,000. Defendant testified that he used the $5,000 to pay his accountant, make a house payment, and take care of other expenses. Defendant estimates he paid his accountant $2,000 cash for filing his 2014-2016 tax returns. Defendant also paid $1,300 cash to his landlord for his house payment, which is common practice under their land-sale contract, and the remainder to cover household expenses. Plaintiff appears to take issue with the agreement Defendant produced because it was not signed by the parties. The court finds that Defendant's testimony was credible. The terms of the agreement were the basis of the deal whether Defendant has a signed copy or not. The court also finds that Defendant did not knowingly or fraudulently withhold documents relating to his property or financial affairs. Thus, Defendant prevails on this claim.

13

*b. Section 727(a)(5) – EDF Contract Rights*

Next, Plaintiff alleges that Defendant has neglected to provide a satisfactory explanation regarding the disposition of the proceeds of sale of his EDF Contract Rights. Thus, Plaintiff argues, Defendant is ineligible for discharge under § 727(a)(5).

Section 727(a)(5) states that the court shall grant the debtor a discharge unless the debtor "has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . . ." § 727(a)(5). "Under this section, the party objecting to discharge has the initial burden of proving substantial and identifiable assets that the debtor owned at a time not too far removed from the bankruptcy that are no longer available for creditors." Strzesynski v. Devaul (In re Devaul), 318 B.R. 824, 839 (Bankr. N.D. Ohio 2004) (citing Caterpillar, Inc. v. Gonzalez (In re Gonzalez), 302 B.R. 745, 754-55 (Bankr. S.D. Fla. 2003)). "The burden then shifts to the debtor to satisfactorily explain the loss or deficiency of assets." Strzesynski, 318 B.R. at 839 (citing Caterpillar, 302 B.R. at 745-55).

"The debtor's explanation 'must be reasonable and credible so as to satisfy the court that the creditors have no cause to wonder where the assets went.'" Strzesynski, 318 B.R. at 839 (quoting Union Bank of the Middle East Ltd v. Farouki (In re Farouki), 133 B.R. 769, 777 (Bankr. E.D. Va. 1991)). "'To be satisfactory, the explanation must demonstrate the debtor has exhibited good faith in conducting his affairs and explaining the loss of assets.'" Strzesynski, 318 B.R. at 839 (quoting Clean Cut Tree Serv. v. Costello, 299 B.R. 882, 901 (Bankr. N.D. Ill. 2003)). The bankruptcy court has broad discretion in determining whether a debtor's explanation is satisfactory. Hake, 387 B.R. at 512 (citing Westerfield v. World Investment Corp., No. 6: 06-20-DCR, 2006 U.S. Dist. LEXIS 25772, at * 10 (E.D. Ky. May 2, 2006)).

For many of the reasons explained previously, the court is satisfied with Defendant's explanation regarding the disposition of the $5,000. Defendant produced a copy of the sale agreement, and he credibly explained that he used the $5,000 to pay his landlord, his accountant and various household expenses. Defendant's actions do not exhibit a lack of good faith in conducting his affairs or explaining a loss of assets.

*c. Section 727(a)(2)(A) – EDF Contract Rights*

Plaintiff claims that Defendant has "transferred, removed, destroyed, mutilated or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed" his EDF Contract Rights (or the proceeds of sale of same) in violation of § 727(a)(2)(A).

Under that section, the court shall deny a debtor a discharge if "(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within

14

one year before the date of the filing of the petition . . . ." § 727(a)(2)(A). "This section encompasses two elements: 1) a disposition of property, such as concealment, and 2) 'a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act disposing of the property.'" Keeney, 227 F.3d at 683 ((quoting Hughes v. Lawson (In re Lawson), 122 F.3d 1237, 1240 (9th Cir. 1997)). Section 727(a)(2)(A) is to be liberally construed in favor of the debtor. Buckeye Ret. Co., LLC v. Swegan (In re Swegan), 383 B.R. 646, 653 (B.A.P. 6th Cir. 2008).

Defendant's failure to disclose the sale of his EDF Contract Rights until he amended his petition on August 21, 2018 was not the product of an intent to hinder, delay, or defraud; rather, it was the result of a mistake and/or inadvertence. For many of the reasons stated supra regarding Plaintiff's claim under § 727(a)(4)(A), Defendant did not possess the requisite subjective intent to defraud under § 727(a)(2)(A). Therefore, Plaintiff's § 727(a)(2)(A) claim fails.

    *d. Section 727(a)(5) – The Midwest Companies*

Next, Plaintiff asked the court to deny Defendant's discharge under § 727(a)(5) because of Defendant's lack of records regarding the Midwest Companies. In essence, Plaintiff claims that Defendant has failed to satisfactorily explain: (i) the demise of the Midwest Companies; and (ii) how Defendant went from successful businessman to bankrupt.

Under § 727(a)(5):

> Two conditions must exist in order for [the trustee] to meet the initial burden of showing that there exists a loss or a deficiency of a prepetition asset that could have been used to pay creditors: (1) the debtor had a cognizable ownership interest in a specific fund(s) or identifiable piece of property; and (2) that such an interest existed at a time not too far removed from when the petition was filed.

Baker v. Reed (In re Reed), 310 B.R. 363, 369 (Bankr. N.D. Ohio 2004) (citation omitted). "Once this burden has been established, the burden then shifts to the debtor to come forward with evidence that will satisfactorily explain the loss of the asset." Reed, 310 B.R. at 369 (citation omitted).

When the Midwest Companies were at their peak, it was not uncommon for Defendant and Dixon to each take home over half a million dollars annually in salary and bonuses. However, as Defendant and Dixon credibly explained at trial, the Midwest Companies could no longer compete with the new technology phone companies were using, and their old business products and models were not profitable, so the Midwest Companies faced serious financial difficulties from 2008 to 2010. This was at the time of the national financial panic, and FirstMerit Bank put the Midwest Companies under. Rose's testimony corroborates this point;

15

she explained that from 2008 to 2010 Defendant's income decreased.[7] Defendant and Dixon testified that, sometime in late 2011 or early 2012, the Midwest Companies' CPA took possession of the companies' old books and records. Neither Defendant nor Dixon retained these records.

The court is satisfied with Defendant's explanation. Moreover, Defendant cannot reasonably be expected to retain records from the Midwest Companies, which ceased operations over 5 years before Defendant filed his bankruptcy petition. See Cohen v. Olbur (In re Olbur), 314 B.R. 732, 741 (Bankr. N.D. Ill. 2004) ("a debtor should not be deprived of a discharge merely because he can no longer explain (or can explain but cannot document) a loss of assets years before the bankruptcy."); see, e.g., Hake, 387 B.R. at 512, 513 ("Here, Buckeye attempted to rely on documentary evidence from more than five years prior to Debtor's bankruptcy filing, which, under the circumstances, the Court finds is too remote in time to support a cause of action under § 727(a)(5)."). Accordingly, Plaintiff's claim fails.

### 4. Claim Relating to the EDF Contract Rights Not Alleged in Complaint

In her post-trial brief, Plaintiff argues that Defendant's failure to retain records relating to the sale of his EDF Contract Rights warrants a denial of discharge under § 727(a)(3). (Pl's Post-Trial Br. at 4-5.) But Plaintiff did not allege this cause of action in her complaint. Nor has Plaintiff filed a motion to conform the pleadings to the evidence in accordance with Rule 7015.

Rule 15(b) of the Federal Rules of Civil Procedure, incorporated into adversary proceedings by Rule 7015, provides:

> (1) Based on an Objection at Trial. If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.
>
> (2) For Issues Tried by Consent. When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

---

[7] Dixon also testified that he recently spoke with local bankruptcy counsel to discuss his options.

Fed. R. Civ. P. 15(b).

There are "two mechanisms" under Rule 15 for amending the complaint to conform to the evidence. Green Country Food Mkt., Inc. v. Bottling Group, LLC, 371 F.3d 1275, 1280 (10th Cir. 2004). First, a complaint may be impliedly amended "if an issue has been tried with the express or implied consent of the parties and not over objection." Id. (citation omitted). A party can impliedly consent by introducing new evidence on the issue or by failing to object to evidence raised on the issue; however, "implied consent cannot be based on the introduction of evidence that is relevant to an issue already in the case when there is no indication that the party presenting the evidence intended to raise a new issue." Id. (citation omitted). Second, a complaint may be amended "if the party files a motion to amend the complaint and the objecting party fails to satisfy the court that it will be prejudiced by the amendment." Id. (citation omitted). However, the party must "expressly move" for such an amendment. Id. (citation omitted); see also 3 Moore's Federal Practice - Civil § 15.18.

In this case, the complaint is not impliedly amended and Plaintiff has not filed a motion to conform to the evidence. At trial, Defendant objected to the introduction of any evidence not relevant to the claims alleged in the complaint. In addition, although Plaintiff mentioned that she may be filing a motion to conform, no such motion has been filed. Therefore, the court declines to treat Plaintiff's complaint as amended to include a § 727(a)(3) claim with respect to the EDF Contract Rights.[8]

## V.  CONCLUSION

Plaintiff has failed to meet her burden of proof with respect to each of her claims. Accordingly, Defendant is entitled to a discharge. The court will enter a separate judgment against Plaintiff and in favor of Defendant.

#      #      #


**Service List:**

Michael J. Moran
Gibson & Moran
PO Box 535
234 Portage Trail
Cuyahoga Falls, OH 44222

---

[8] Even if the court did treat the complaint as amended, such claim would fail. At trial, Defendant provided a copy of the sale agreement for the EDF Contract Rights and credibly testified how the $5,000 were spent. Defendant's lack of additional records is justified under the circumstances, since Defendant's accountant and landlord were paid in cash and this, per Defendant, was common practice between the parties.

Edwin Breyfogle
108 Third Street N.E.
Massillon, OH 44646

18